IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:11-cr-0424-CLS-MHH |
| ) | |
| ARTAVIS DESMOND MCGOWAN, ) | |
| ) | |
| Defendant. ) | |

### TRIAL MEMORANDUM

Comes now the Defendant, Artavis Desmond McGowan, by and through his undersigned counsel, and files this Trial Memorandum to assist the Court in preparing for trial and to identify issues that may require particular attention during the course of the trail.

**I.    CHARGES**

Count One of the indictment charges Mr. McGowan with conspiracy to distribute and to possess with the intent to distribute five kilograms or more of cocaine hydrochloride, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A). The Government alleges that the conspiracy occurred from on or about August 2011, and continued until on or about October 5, 2011.

Count Two of the indictment charges Mr. McGowan with possession with intent to distribute 500 grams or more of cocaine hydrochloride.

Count Four of the indictment charges Mr. McGowan with possession with intent to distribute twenty-eight grams or more of cocaine base ("crack" cocaine), 100 grams or more of heroin, and an amount of marijuana.

## II.    SUMMARY OF FACTS TO BE ADDUCED AT TRIAL

In August of 2011, agents of the Drug Enforcement Administration in Birmingham were contacted by DEA agents in Austin, Texas, regarding possible shipments of heroin to Birmingham. Two people had been arrested in Texas and apparently one of those became a Cooperating Source (Hereinafter "CS"). This CS indicated that on three to four prior instances, he/she had transported heroin from Austin, Texas to Birmingham, Alabama. On one of those trips, prior to August, 2011, he/she had driven a white or gray Lexus and had been stopped by a police officer and received a traffic citation.

Other details relating to the investigation were discussed including a green Jetta, as well as information concerning what the driver from Texas would do when arriving in Birmingham. The driver would surrender the "load car" to a heavy-set Hispanic male (otherwise unidentified) and would wait for a few hours after he drove off until the "load car" returned. Further investigation into the green Jetta resulted in a GPS tracking device being placed on the Jetta some time in September, prior to a warrant being obtained. Based on the information transmitted by this GPS tracking device, the Jetta was tracked to a parking lot at a hotel in Homewood, Alabama. After observing the Jetta in close proximity to a Lexus, which had a Texas license plate, special agent Sean Steven contacted agents in Texas and confirmed that this license plate number was the one which was on the traffic ticket two or three months earlier when the car had been while being

driven by the CS.

On October 5, 2012, when Donaldo Cruz left the hotel parking lot driving the Lexus, agents maintained visual surveillance and followed it approximately ten miles to a house located at 1156 Skyline Drive in Birmingham, Alabama. The Lexus was parked in a driveway at the house in front of a basement garage door. No one saw where the driver went. Agents were unable to keep a constant surveillance on the Lexus because of the location, but were able to establish a close perimeter on all access streets to insure that it could not leave the house without being observed. In spite of the limitations, at least one agent was able to position himself so that he could see one side and a portion of the rear of the house. In addition, agents conducted drive-by surveillance from time to time.

The Lexus arrived at the house on Skyline Drive at approximately 10:25 a.m. Later, at 10:30 a.m., a white Toyota SUV arrived at the house and parked in the rear. A few minutes later, the Toyota left the house and agents on the scene requested Jefferson County Sheriff's Deputies to conduct a traffic stop of the Toyota. When Deputies stopped the Toyota, the driver was identified as James Harris. A request was made for consent to search the vehicle, which was granted. Approximately thirty minutes later, nothing incriminating was found and Mr. Harris was released. Mr. Harris then drove to a parking lot where he got out of the Toyota and got into a Chevrolet Avalanche and drove back to Skyline Drive accompanied by an unknown passenger. He arrived back at the house at 11:55 a.m. Mr. Harris briefly parked at the rear of the house and left again a few minutes later. He was not stopped at this time by anyone. Around noon, an agent drove by the house and discovered that the Lexus was no longer in the driveway. The agents believed that the Lexus must have been pulled into the garage, although no one saw it.

At around 1:00 p.m., agents on the scene sent Agent Matt Gentry to begin work on an Affidavit in support of a Search Warrant for the house on Skyline Drive. While he was preparing the Affidavit, there were people entering and leaving the house. At 1:15 p.m., Anthony McGowan left in a white Honda, which had been parked in front of the house. At 2:50 p.m. Princess Floyd left in a white Acura that also had been parked in front of the house. Neither of these vehicles were stopped or searched. Items were located at the house that led investigators to believe Anthony and Princess were residents of the house.

At 3:02 p.m., a black Jeep arrived at the residence. Approximately eight minutes later, the Jeep with three occupants left the residence. No one observed any of the Jeep's occupants enter or exit the house. One black male was observed standing outside the Jeep in the yard. DEA Agents contacted Jefferson County Deputy William Schuelly and asked him to stop the Jeep and identify the occupants. Deputy Schuelly initiated the stop based on his belief that the Jeep was speeding. At no time was a radar device used to "clock" the Jeep speeding. Agents continued to follow the Jeep and were able to observe the events that were going on after the Jeep had been stopped for a traffic violation. At approximately 3:20 p.m. a warning ticket for speeding was issued by the deputy and given to the driver a few minutes later, Defendant, Artavis Desmond McGowan (hereinafter McGowan). His license was then returned and Deputy Schuelly engaged in additional questioning of McGowan. Thirty seconds to a minute later, the deputy asked McGowan if there was any gun, marijuana, pills, cocaine, heroine or stolen property in the Jeep before requesting consent to search the Jeep. McGowan, with other officers and a canine nearby stated, "you don't have to waste your time bro, I already know the routine," and several members of the Sheriff's department conducted a search on the

Jeep. As the search was conducted, the officers noted several items. There was approximately $3,000.00 on each of the three occupants and additional currency located in a briefcase within the Jeep. During the stop, deputies asked to whom the briefcase belonged, and were told it belonged to McGowan. Also, the deputies asked who the phones belonged to, and someone answered the phones belonged to them.

There was an empty box that had a label of a Food Saver Brand Heat Sealer device. Purportedly, there was an odor of marijuana on the breath of a passenger as Deputy Schuelly removed him from the vehicle. However, nothing illegal was found anywhere in the vehicle or on any of the occupants.

Throughout the traffic stop and subsequent search, the deputies on the scene were in constant contact via telephone with the agents from the DEA who continued surveillance on the house on Skyline Drive. After approximately an hour, around 4:00 p.m., Deputy Schuelly was talking with Agent Dorsey with the DEA. Shortly after 4:00 p.m, Deputy Schuelly told Agent Dorsey that the traffic stop was about finished and Deputy Schuelly had found nothing after the very thorough search of the Jeep other than the money, cigars, sunglasses and an empty cardboard box. Deputy Schuelly also indicated that one of the passengers had a smell of marijuana on his breath, and he believed the passenger had swallowed some marijuana. However, Deputy Shuelly indicated there was nothing else present to continue to detain them.

At this time, Agent Dorsey indicated that law enforcement were about to conduct a search of the house and instructed Deputy Schulley to hold the occupants of the Jeep until an agent called him back to allow them to be released or came and picked them up. Deputy Schulley then relayed that information to another deputy there on the scene and

told him that they were going to "stall" until further notice and that they were not required to tell the occupants anything, but if they revoked consent, he had smelled marijuana and the search could continue.

Shortly after that, McGowan requested that he be released and questioned the continued detention. Deputy Schulley told McGowan that he was not under arrest but he was being detained, and he was not free to go. Several minutes passed and at 4:18 p.m., forced entry was made into the home at Skyline Drive. A Hispanic male was discovered in the basement along with illegal substances and a sum of United States Currency. At no time was there any opportunity for McGowan or either of the other two occupants to leave the scene of the traffic stop. Furthermore, there was never any information divulged to McGowan or either of the other two occupants that surveillance was being conducted or a search was about to occur at the house at Skyline Drive. In addition, the traffic stop occurred more than two miles from the house and no one could see any surveillance being conducted by law enforcement from the scene of the traffic stop.

The affidavit in support of a search warrant for 1156 Skyline Drive consisted of the facts related to the GPS monitoring of the Jetta, facts related to the stop of McGowan in the Jeep, as well as an unsupported statement that McGowan was a "known drug dealer." At 4:40 pm., a search warrant was signed by Alabama Circuit Court Judge Virginia Vinson and delivered to the house at Skyline Drive at approximately 4:50 p.m. A thorough search of the house was then conducted where narcotics and cash were recovered, among other evidentiary items. At approximately 5:00 p.m. McGowan and the other occupants were transported to the house at Skyline Drive and McGowan was informed that he was under arrest for possession of narcotics.

Several items were located inside the bedroom located in the basement. Nothing located was actually addressed to "Artavis McGowan" or showed signs that he lived in the bedroom. By all indications, Mr. McGowan resided at a different location. Based on information and belief, no one can testify to ever seeing Mr. McGowan enter the house located at 1156 Skyline Drive.

### III. EVIDENTIARY AND OTHER ISSUES

#### a. *Apprendi* and *Alleyne*

The Government correctly points out in in its trial brief that the factors which increase the penalties contained in Counts One, Two and Four, must be established with proof beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Furthermore, the amount of drugs found must be established with proof beyond a reasonable doubt. *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

#### b. Alleged co-conspirator statements

Although Mr. McGowan has yet to be provided with any statements made by any alleged co-conspirators, defense counsel will attempt to address this issue. The Government indicated these statements will be provided sometime on July 29, 2013.

When determining whether a statement is admissible against a co-conspirator, the Court must find "there is substantial evidence, independent of the extrajudicial statements, 'that (1) a conspiracy existed, (2) that the co-conspirator and the defendant against whom the statement is to be offered were members of

the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." *United States v. Monaco*, 702 F.2d 860, 876 (11th Cir. 1983)(quoting *United States v. Alvarez*, 696 F.2d 1307 (5th Cir. 1983).[1] Furthermore, at the conclusion of the government's case, the Court should reconsider whether the initial *James* ruling was correct and whether the government in fact did prove all three facts "by a preponderance of the independent evidence." *Id.*

While Mr. McGowan cannot be sure, it appears from the Government's trial brief that it intends to use statements made by Mr. McGowan to alleged co-conspirators after Mr. McGowan's arrest.[2] The Eleventh Circuit has held the following:

> "We start with the observation that the post-arrest utterances of coconspirators do not qualify as non-hearsay under Fed. R. Evid. 801(d)(2)(E), which removes from the realm of hearsay statements made by a coconspirator during and in furtherance of the conspiracy. A coconspirator's participation in a conspiracy *ends with his arrest*, and therefore his post-arrest statements are not made during the course of the conspiracy." *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979)(emphasis added)(citing *United States v. Arias-Diaz*, 497 F.2d 165, 171 (5th Cir. 1974); Cert denied, 420 U.S. 1003, 95 S.Ct. 1446 (1975).

---

[1] "We hold that the decision of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard*, 661 F. 2d 1206, 1207 (11th Cir. 1981).

[2] We cannot be sure of this fact because the statements of the alleged co-conspirators have not be turned over at this time.

Most statements made by a co-conspirator after arrests are inadmissible. *United States v. Gomez*, 927 F.2d 1530, 1535 (11th Cir. 1991). The reason is simple: a co-conspirator's participation in a conspiracy concludes at the time of their arrest. *United States v. Payne*, 148 Fed. Appx. 804, 807 (11th Cir. 2005).

The Government contends that the alleged statements made by Mr. McGowan were in furtherance of the conspiracy. While defense counsel has not been able to review all of these newly disclosed statements, they are inadmissible under Rule 801(d)(2)(E).

The Government cited numerous cases in their trial brief. [Doc. 133, p. 15-17]. In almost every case, the defendant in the case had not been arrested when they made a statement to another conspirator. In this case, Mr. McGowan was placed under arrest on October 5, 2011. The Government hopes to use statements made by Mr. McGowan after that date, when his alleged involvement with the crimes for which he had been charged concluded. As the Eleventh Circuit has held, a co-conspirator's involvement in a conspiracy concludes at the time of their arrest. *United States v. Payne*, 148 Fed. Appx. 804, 807 (11th Cir. 2005). Therefore, all statements made by Mr. McGowan after his arrest should be excluded.

> **Evidence Concerning A Conspiracy Involving Marijuana And Heroin**
>    i. **The Evidence is Not Relevant**

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. "Implicit in that definition are two distinct requirements: (1) The evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Hall*, 653 F.2d 1002, 1006 (5th Cir. 1981)(citing McCormick on Evidence §185 at 435 (2d Ed. 1972).

In this case, the evidence the Government wishes to present is not relevant to the indicted crime. If the Government wished to present evidence about a conspiracy involving marijuana and heroin, they have the right to indict Mr. McGowan for those offenses. Evidence regarding those crimes is not relevant to the charged crime of conspiracy involving cocaine.

### ii. Evidence If The Evidence Was Relevant, It Would Be Unfairly Prejudicial.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice…" Fed. R. Evid. 403. "It is well-established that *all* admissible evidence is subject to exclusion under Rule 403." *United States v. King*, 713 F.2d 627, 632 (11th Cir. 1983)(citing *United States v. Frick*, 588 F.2d at 537, n. 3; *United States v. Spletzer*, 535 F.2d 950, 955-56 (5th Cir. 1976).

Mr. McGowan was indicted for a conspiracy involving cocaine. To allow evidence of any alleged involvement in the trafficking of heroin or marijuana would create a danger of unfair prejudice that greatly outweighs the probative value. Therefore, even if this Court holds that the evidence is relevant, the evidence should still be excluded based on the unfair prejudice it would create.

### iii. The Evidence Is Not Inextricably Intertwined Evidence

For evidence to be considered intrinsic, the evidence must be "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Larios-Trujillo*, 403 Fed. Appx. 442, 444 (11th Cir. 2010)(holding testimony regarding the initial illicit relationship was not intrinsic evidence.)

After Figueroa's arrest, he made several statements to law enforcement. Figueroa admitted to transporting cocaine in the load vehicle. However, Figueroa never gave any statements regarding the trafficking of heroin or marijuana. The Government chose to indict Mr. McGowan for the offense of conspiring to "possess with intent to distribute five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride…" [Doc. 23, p. 2]. To allow evidence regarding trafficking of heroin or marijuana would deprive Mr. McGowan of his right to a fair trial guaranteed by the Sixth Amendment to the United States Consitution. Although Mr. McGowan was indicted for the offense of possessing marijuana and heroin with the intent to

distribute, these offenses are not so inextricably intertwined with trafficking evidence. The Government knew of this evidence from the initial arrest. The Government had the option to seek an indictment for trafficking in heroin and marijuana. Its failure to do so should not be rewarded with an ability to taint the jury pool with evidence concerning trafficking in heroin and marijuana.

### c. Chain of Custody

The Government is correct that any breaks in the chain of custody affect the weight of the evidence, not admissibility. *United States v. Sarmiento-Perez*, 724 F.2d 898, 900 (11th Cir. 1984).

### d. Summary and Pedagogical Devices

The Government seeks to introduce a summary exhibit in accordance with Federal Rule of Evidence 611(a), based upon four sets of telephone records. [Doc. 133, p. 20]. Unlike substantive summary charts admitted under Rule 1006, charts, summaries or similar items that are "pedagogical" or "demonstrative" should not be admitted into evidence, and should not go to the jury. *See, e.g., United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004):

> Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) to facilitate the presentation and comprehension of evidence already in the record. See Fed. R. Evid. 611(a); see also 4 Weinstein's Federal Evidence §611.02(2)(a)(vii) (Joseph M. McLaughlin ed., 2d ed. 2003). The "pedagogical" devices are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted. See 6 § 1006.04(2), at 1006-10 to 1006-11. But displaying

> such charts is always under the supervision of the district court under Rule 611(a), and in the end they are not admitted as evidence.

*See also United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000):

> [T]he use of charts as "'pedagogical' devices intended to present the government's version of the case" is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a). Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence. Additionally, such charts are not admitted into evidence and should not go to the jury room absent consent of the parties.

While the Government contends that a summary exhibit will help the jury understand the "hundreds of pages of telephone records," Mr. McGowan disagrees. [Doc. 133, p. 20]. When counting the pages of the actual telephone records there are 31 pages. This is not counting a last set of phone records that the Government intends to provide on July 29, 2013. Considering the original records only consisted of 31 pages, it would seem that a summary exhibit is not necessary in this case.

If the Court finds that the summary exhibits should be allowed, the summary evidence should be excluded from being provided to the jury during deliberations. Also, the Court should order that all summary exhibits be provided to Mr. McGowan at least 24 hours before trial begins.

### e. Forfeiture Trial

At this point, the Defendant request's the jury be retained to determine the Forfeiture allegations, in the event of a conviction. The Defendant will continue to evaluate this decision during the course of the trial.

Currently the United States seeks forfeiture of $500,000 in United States Currency and all interest and proceeds derived therefrom [Doc. 23, p. 5].

### f. Exhibit List

The Defendant has provided opposing counsel with a list of proposed exhibits. The Defendant will provide the Court with a list of exhibits as well.

## CONCLUSION

The remaining issues have already been submitted to the Court for consideration and therefore, will not be addressed here.

Respectfully submitted,

**/s/ James W. Parkman**
ATTORNEY FOR DEFENDANT

OF COUNSEL:
James W. Parkman
Parkman & White, LLC
1929 3rd Avenue North, Suite 700
Birmingham, AL 35203
(205) 244-1920
parkman@parkmanlawfirm.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that I have on this the 29th day of July, 2013, electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

      /s/ James W. Parkman  
      OF COUNSEL