UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** } | |
| } | |
| **v.** } | **Case No.:  2:11-CR-424-RDP-PWG** |
| } | |
| **ARTAVIS DESMOND McGOWAN,** } | |
| } | |
| **Defendant.** } | |

### MEMORANDUM OPINION

Defendant Artavis Desmond McGowan has filed two post-verdict motions seeking judgment of acquittal and, alternatively, a new trial. (Docs. 233, 236).  First, McGowan argues that the court should grant him a judgment of acquittal because some of the evidence at trial included conduct outside the timeframe charged in the Superseding Indictment.  Second, McGowan asserts that he is due a new trial because of a juror note that brought to the attention of the court the possibility that a spectator took photos of the jury.  For the reasons discussed below, the court concludes both motions are due to be denied.

**I.    INTRODUCTION**

In December 2011, the defendant, Artavis McGowan, was charged with conspiracy to possess with the intent to distribute and to distribute over five kilograms of cocaine hydrochloride from around August 2011 to about October 5, 2011 (Count One). He was also charged with two substantive counts of possession with the intent to distribute various types of controlled substances found in a home located at 1156 Skyline Drive on October 5, 2011. (Counts Two and Four).

The charges against McGowan have been the subject of two trials. The first trial began on Monday, August 5, 2013, before the Honorable Lynwood C. Smith, Jr. After four days, the jury returned a partial verdict acquitting McGowan of the substantive counts, Counts Two and Four, but the jurors were unable to reach a verdict on the remaining conspiracy charge in Count One.

On Monday, November 18, 2013, the second trial began.[1] At that trial, DEA agents and task force officers testified that McGowan was present at 1156 Skyline Drive on October 5, 2011, and the subject of a traffic stop of his Jeep that same day. The evidence at trial indicated that during the traffic stop items of evidentiary value were seized, including an empty FoodSaver box (a FoodSaver is a commonly-used item in the packaging of drugs), large amounts of cash, and cellular telephones. Evidence at trial also included items connected to McGowan that were found near an area in the basement kitchen where drug operations were open and obvious, including several cocaine-laden kilogram wrappers. Two of the wrappers had latent fingerprints matching McGowan. The fingerprint evidence was not presented by the Government at the first trial.

Agents also seized from the Skyline Drive address passport photos and a Mexican ID card of Jose Tavera Ugarte ("Tavera"), who testified at trial. The Government's evidence included a significant number of photos of the interior of the residence and the drugs, cash, and drug-related items seized. Agents also found personal items at the house that were connected to McGowan. Exhibits admitted into evidence included cellular telephones, digital scales, drug packaging materials, money counters, and over 50 empty kilogram wrappers from the trash. Agents also recovered a Sam's Club card from McGowan's wallet. That card, along with other

---

[1] Prior to the second trial, McGowan moved to dismiss the remaining conspiracy count arguing double jeopardy and collateral estoppel. (Doc. 151). That motion was denied. (Doc. 156). The court also ruled on his motion to suppress the wiretap communications in the case. (Doc. 221).

evidence adduced by the Government, indicated that McGowan had purchased four money-counters of the same type found inside 1156 Skyline Drive. Finally, Tavera testified in detail about how he and McGowan, along with others, were involved in an extensive and ongoing cocaine trafficking conspiracy. Tavera testified that, on more than ten occasions he drove a vehicle with a hidden compartment to the basement of the home at 1156 Skyline Drive. There, McGowan would let him into the house and it was Tavera's job to remove the cocaine from the hidden compartment inside the bumper of the vehicle, process the cocaine, count and package the money, and place the money inside the hidden compartment. Tavera also testified that he trained another individual (Figueroa) to perform these tasks.

During the trial, Tavera also explained that after McGowan was arrested, he continued to bring drugs to James Harris and McGowan; however, due to McGowan's house arrest, Tavera was forced to deal directly with Harris. Evidence at trial also included several intercepted telephone calls between Harris and McGowan that evidenced their continued involvement in the conspiracy. One of those telephone calls between Harris and Tavera was played as evidence of their continued dealings. Again, similar to the fingerprint evidence, the Government did not present these recorded calls at the first trial.

Following the Government's case, the defense called several witnesses. Part of that proof was intended to explain the large sums of money found during the search of McGowan's Jeep. However, these explanations were contradicted by IRS records showing that McGowan had not paid taxes in over seven years. McGowan also put on evidence which called the Government's fingerprint evidence into question.

The jury began its deliberations late in the afternoon of Monday, November 25. After deliberating for approximately one hour, the jury sent out a note: "We have a concern that a

female spectar [*sic*] took a picture of the jury with her cell phone." (Doc. 226). If a photograph was taken, that action was in violation of the court's posted rules. A sign on the door of the courtroom prohibits the use of cellular telephones, cameras, or other recording devices. The note prompted the court to have an on-the-record meeting in chambers at which the United States Marshal for the Northern District of Alabama, Government counsel, and defense counsel all discussed options for handling the matter. A number of topics were discussed, but at that point it was not even clear whether a picture had been taken. Indeed, there was a possibility that perhaps the phone was simply raised while the owner was checking a text message or engaging in some other telephone function. At that point, the decision was made to direct the courtroom deputy to advise the jury that the matter was being looked into, but that the jurors should continue deliberations.

About forty-five minutes later, the jury sent out another note, this time requesting to listen to intercepted wiretap calls admitted into evidence in the case. After listening to the calls, the jury continued its deliberations.

Sometime later, a third note was forwarded to the court. It asked about the total weight of the cocaine and "crack" cocaine seized. It was at this point that defense counsel advised that Defendant was requesting a mistrial based on the jury's first note. In particular, the defense argued that McGowan was prejudiced due to a possibility that a juror or jurors had been intimidated by a photo being taken. This prompted the court to direct the parties to brief the issue overnight and report back in the morning.

Before the jury recessed for the day, and before the court had an opportunity to respond to its third note, the jury advised the court that it had reached a verdict. With the consent of both parties, the court asked the jury (through the courtroom deputy) if it still had a question regarding

the weight of the controlled substances involved in the case.  The foreperson responded that the jury no longer had a question related to weight and that the jurors had found what they needed in the jury instructions of the court and the evidence. Based upon that response, all parties agreed the question contained in the third note was moot. The Government opposed the defense's motion for a mistrial.  The court overruled the motion for a mistrial and received the verdict. The jury found McGowan guilty of Count One, and further determined that he was responsible for over 5 kilograms of cocaine hydrochloride. (Doc. 229).

## II.  DISCUSSION

### A.  McGowan's Post-Verdict Rule 29 Motion.

Federal Rule of Criminal Procedure 29(c) provides that "[a] defendant may move for a judgment of acquittal" after the jury returns a guilty verdict, and the district court "may set aside the verdict and enter an acquittal."  However, to be sure, "[i]n our adversary system, there is a clear demarcation between the role of the district court and the jury.  The district court superintends the admission of evidence, after which the jury, 'as the ultimate fact-finder . . . determines, finally, where the truth in any case lies.'" *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011) (reversing post-verdict judgment of acquittal). Under Rule 29, a district court may overturn the jury's verdict and enter a judgment of acquittal only "if there is insufficient evidence to sustain the verdict."  *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004).

When faced with a Rule 29 motion, the trial court must "view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005) (quotation omitted) (reversing post-verdict judgment of acquittal).  Thus, the court

must "resolve any conflicts in the evidence in favor of the Government and accept all reasonable inferences that tend to support the Government's case"—"whether the evidence is direct or circumstantial." *Williams*, 390 F.3d at 1324.  "A criminal conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010).  And because the jury is "free to choose between or among the conclusions to be drawn from the evidence presented at trial," the evidence "need not rebut all reasonable hypotheses other than guilt." *Miranda*, 425 F.3d at 959 (quotations omitted).  That is, the court "must accept all reasonable inferences and credibility determinations made by the jury." *Id*. (quotations omitted).

The thrust of McGowan's Rule 29 motion relates to his argument that the court erred in admitting wiretap evidence that was obtained after the dates charged in the Superseding Indictment related to the drug conspiracy. McGowan's argument is off the mark for two reasons.

First, McGowan's Rule 29 argument ignores the substantial evidence that connects him to the drug conspiracy, separate and apart from the wiretap evidence. Indeed, here, there is more than enough evidence to link McGowan to the drug conspiracy even in the absence of the wiretap evidence about which he complains. The evidence, considered in the light most favorable to the Government (and the jury's verdict), is that on October 5, 2011, McGowan had just left the house at 1156 Skyline Drive.  His Jeep was stopped and agents recovered the empty FoodSaver box and multi-colored rubber bands—items similar to those that were seized from the Skyline Drive basement.

A search was also conducted of the house on Skyline Drive.  In the basement bedroom, agents found McGowan's keepsakes and greeting cards along with photos of Tavera.  From McGowan's wallet, the agents recovered the Sam's Club card which was used to purchase the

Royal Sovereign money counters. McGowan also had large sums of cash in his pocket and briefcase which were not explained by evidence put forth in his case in chief. His cell phone, which was recovered from the console of the Jeep, was linked to the area code 512 number for Tavera found on the refrigerator in the kitchen at Skyline Drive. In addition, Tavera testified at trial and explained in detail the whole of the conspiracy. Finally, there was evidence that McGowan's and Figueroa's fingerprints each were found on empty kilogram wrappers which contained cocaine residue and were recovered at the scene.[2]

Second, and in any event, McGowan fails to acknowledge the distinction between cases where the core of evidence presented is within the timeframe charged in the indictment and those where there has been a material variance from the indictment. The vast majority of the evidence connecting McGowan to the conspiracy centered around the events of October 5, 2011. The conversations evidenced in the wiretap evidence did not relate to an essential element of the conspiracy and did not broaden the charge. Rather, that additional evidence merely confirmed that McGowan was part of *the* conspiracy charged in the Superseding Indictment.[3] Moreover, the wiretap conversations did not materially alter the time scope or the purpose of the conspiracy, but instead represented additional evidence that McGowan was involved in the conspiracy alleged in the Superseding Indictment. In other words, the evidence showed that the conspiracy

---

[2] McGowan correctly notes that the jury in the first trial was hung on Count One, and acquitted him as to the substantive counts of possession with intent to distribute (Counts Two and Four). But that first jury did not have the benefit of evidence indicating that McGowan's fingerprints were detected on the kilo wrappers with cocaine residue, evidence that the second jury heard and necessarily considered.

[3] This is not a case where the Government put on evidence of multiple conspiracies at trial despite only alleging a single conspiracy in the charging document. Rather, the 2013 wiretap evidence merely presented *additional* evidence that McGowan was involved in the conspiracy charged in the Superseding Indictment.

was ongoing[4] and that McGowan was a part of it.

In *United States v. Meester*, the Eleventh Circuit considered whether the district court erred in admitting evidence of a murder by members of a drug conspiracy where the murder occurred after the time period of the drug conspiracy charged in the indictment. 762 F.2d 867 (11th Cir. 1985). The Eleventh Circuit affirmed the district court's evidentiary ruling and in doing so stated that the "evidence of the murder was properly admitted as relevant to show the continuing nature of the conspiracies to import and possess. There was also no variance between the indictment and the proof at the trial because evidence of the murder was admitted for the purpose of demonstrating the elements of the charged conspiracies." *Id*. at 876, n. 6. F.2d 915 (11th Cir. 1987); *see United States v. Varella*, 692 F.2d at 1362. Similar to *Meester*, here there is no variance between the Superseding Indictment and the Government's conspiracy proof at the second trial.

Finally, even if McGowan could establish a material variance (and to be clear, he has not), he must also demonstrate substantial prejudice, which means that (1) the proof at trial differed so greatly from the charges that he was unfairly surprised and unable to prepare an adequate defense, or (2) so many defendants and separate conspiracies were presented to the jury that a substantial likelihood exists that the jury transferred proof of one conspiracy to a defendant involved in another. *United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997). McGowan cannot show prejudice under this standard. There was no unfair surprise in the

---

[4] In *United States v. Coia*, 719 F.2d 1120, 1125 (11th Cir. 1983), the court reasoned, "where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." "A conspiracy is presumed to continue until its objectives have been abandoned or accomplished." *United States v. Richardson*, 532 F.3d 1279 (11th Cir. 2008). The evidence at trial showed that after McGowan had been released on a bond, he continued his involvement in the conspiracy with Tavera, Harris, and others, albeit in a different role. "In many cases it is difficult to prove the precise beginning or end of a conspiracy. Ample authority allows the trial court broad discretion to determine that a conspiracy terminated after the defendant said it ended." *United States v. Aquafredda*, 834 F.2d 915, 919 (11th Cir. 1987), *cert. denied sub nom.*, 485 U.S. 980 (1988); *see United States v. Varella*, 692 F.2d 1352, 1362 (11th Cir. 1982), *cert denied*, 464 U.S. 838 (1983).

Government's presentation of the 2013 wiretap evidence.[5]  In addition, again, the evidence simply confirmed McGowan's role in the conspiracy with Tavera and others continued even after his arrest.

McGowan next argues that the Government, in presenting the 2013 wiretap evidence, constructively amended the Superseding Indictment. (Doc. 236 at 1).  The court disagrees. A constructive amendment occurs "when the evidence presented at trial and the instructions given to the jury so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Gonzalez*, 661 F.2d 488, 492 (11th Cir. 1981).  McGowan suggests that the essential elements of the offense in the Superseding Indictment were amended by the Government's proof at trial, but he does not explain how that could be the case.  (*See* Doc. 236 at 2).  In fact, there was no modification of an essential element of the offense.  The wiretap evidence, which again only supplemented the evidence introduced at trial regarding McGowan's participation in the conspiracy, in no way altered the essential elements[6] of the Government's conspiracy charge. Indeed, regardless of the outcome of McGowan's attempt to exclude the wiretap evidence, nothing about the proof requirements would have changed:  the elements of the charge would have been the same; the co-conspirators involved would have been the same; and the object of the conspiracy would have been the same.

---

[5] McGowan's argument that he was not on notice of the wiretap evidence due to the time period charged in the Superseding Indictment is simply wrong.  As the record in this case makes clear, McGowan received all of the wiretap evidence admitted long before his trial. Indeed, he filed a motion to suppress the wiretap evidence that was litigated and ruled upon the first day of trial.  (Docs. 212, 221).

[6] The date and time of an offense are not essential elements.  *United States v. Steele*, 178 F.3d 1230, 1234 (11th Cir. 1999); *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989) ("When the government charges that an offense occurred "on or about" a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment.")

### B. McGowan's Post-Verdict Rule 33 Motion.

Federal Rule of Criminal Procedure 33 provides that a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Here, McGowan's Rule 33 motion is based upon his assertion that the jury was exposed to extraneous information in the form of an individual who may (or may not) have photographed the jury.

To justify the grant of a new trial on the basis of one or more jurors being exposed to extraneous information, a defendant bears the initial burden of making "a colorable showing that the exposure has, in fact, occurred." *United States v. Whatley*, 719 F.3d 1206, 1219 (11th Cir. 2013), quoting *United States v. Siegelman*, 640 F.3d 1159, 1182 (11th Cir. 2011). "A mistrial or new trial is required only if the extrinsic evidence known by the jury posed a reasonable possibility of prejudice to the defendant." *United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006).

If the defendant makes this requisite showing, "prejudice to the defendant is presumed and the burden shifts to the government to show that the jurors' consideration of extrinsic evidence was harmless to the defendant." *Whatley*, 719 F.3d at 1219. The "presumption of prejudice" arises upon a showing of two elements: that an extraneous contact with or by a member of the jury took place, and that the contact was "about the matter pending before the jury." *Boyd v. Allen*, 592 F.3d 1274, 1305 (11th Cir. 2010), quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954).

### C. There is insufficient evidence to conclude that there was any actual extrinsic contact with the jury.

McGowan's argument for a new trial based upon the jury's initial note makes an assumption not warranted by the record—that the jury believed a photograph had been taken of

them and that the reason the photograph was taken was to influence their verdict in the case. The relevant note from the jury did not say that—it merely stated a concern that a photo had been taken. In discussing the many potential interpretations of the note, the parties discussed the distinct possibility that no photo was ever taken, but rather, a phone was out while a spectator was reading an email or text message.[7] But even assuming the jury believed a photo was actually taken, there is nothing to suggest that it was related to a "matter pending before the jury." *Boyd*, 592 F.3d at 1305. Without any factual support, McGowan jumps to the conclusion that the jury was intimidated by an unidentified female spectator who may (or may not) have taken a photo in the courtroom. Of course, it is just as possible that the jury sent the note out for no reason other than to alert the court to the possibility that a posted rule of the court may have been broken by a spectator. The jurors walked by the front door of the courtroom every day of the trial. At that front door a sign prohibiting cell phones, cameras and similar devices was prominently displayed. There is nothing in the note to suggest that any juror felt threatened or intimidated, or that any juror held the action against McGowan at all. To the contrary, they were notified that the court was looking into the matter and, after being so informed, continued to deliberate. The jury was told to continue with their work—and the jurors did just that. They asked several intelligent questions demonstrating that their deliberations were ongoing, that they were interacting with the evidence, and that they were unaffected by the alleged "contact."

> **D.  Even if there was an extrinsic contact with the jury, that contact did not present a reasonable possibility of prejudice to McGowan.**

Even assuming a photograph was taken (or, at least, that one or more jurors believed one was taken), McGowan's motion for a new trial fails for a separate reason: he has failed to make

---

[7] In this day and time, the court cannot even rule out the possibility that a spectator was taking a "selfie." This observation is neither an attempt at humor nor is it offered to make light of this situation. Rather, it is to point out that it is impossible at this point to say exactly what occurred.

11

any showing whatsoever that there is a reasonable possibility he was prejudiced. As stated above, there was nothing in the jury's note from which to conclude that any juror felt threatened or intimidated. When the jury's note was brought to the attention of the parties, the consensus was that the note did not itself indicate any prejudice. Indeed, it was agreed by the parties (and determined by the court) that a full scale inquiry of the jury would only highlight the issue, and potentially interject prejudice. Finally, it is not lost on the court that it was only when the jury asked a question regarding the weight of the controlled substances—an inquiry that may presuppose a verdict of guilty—that McGowan moved for a mistrial.

### E.    Even if the contact reached the jury and posed a reasonable possibility of prejudice to McGowan, such information was harmless to the jury's determination of the case.

The court looks to four factors to determine whether extrinsic contact with a juror is harmless to the jury's determination of the case. *Whatley*, 719 F.3d at 1219. The Government bears the burden on these factors. *United States v. Winkle*, 587 U.S. 705, 714 (5th Cir. 1979). In this case, after careful review, the court concludes that all four factors weigh in favor of a finding that the jury's verdict was unaffected by the potential taking of a photo.

#### 1.    The nature of the extrinsic evidence

The first question published by the jury merely noted that the jury had a concern that a photograph may have been taken. Along the spectrum of potential contact with a juror, this incident was extremely limited. Indeed, in more much minacious circumstances, the Eleventh Circuit held that the district court did not abuse its discretion in denying a defense motion for a mistrial where, after the verdict, a juror relayed that during the trial a person who resembled the defendant "locked eyes with her" and that she felt an "overwhelming presence of danger or evil" associated with the defendant and his family. *United States v. Khanani*, 502 F.3d 1281, 1291

(11th Cir. 2007). Other courts have similarly overruled motions for a new trial in more intimidating circumstances. *E.g., United States v. Tejeda*, 481 F.3d 44, 52 (1st Cir. 2007) (affirming denial of mistrial where Tejeda's grandfather made a throat-slashing gesture before the jury), *cert. denied*, 552 U.S. 1021 (2007); *Leisher v. Conrad*, 41 F.3d 753, 754-55 (D.C. Cir. 1994) (affirming denial of mistrial when two jurors misinterpreted as menacing a gesture made by defendant outside of courtroom); *United States v. Zelinka*, 862 F.2d 92, 93, 94-96 (6th Cir. 1988) (affirming denial of mistrial when spectator who appeared to be associated with defendant made statement that it would be too bad if the elevator the jurors were boarding should crash, causing fear on the part of some of the jurors). This "extrinsic" evidence falls far short of the evidence involved in these cases.

 2. <u>The manner in which it reached the jury</u>

McGowan's argument centers around the jury's note, which again expressed concern about an unidentified spectator possibly taking a photograph of the jury while inside the courtroom. The vast majority of cases in this area deal with much more substantial contact with the jury. *United States v. Dunn*, 2013 WL 4081315 (11th Cir. 2013) (juror made contact with a relative who was an attorney for an explanation of the law); *Boyd*, 592 F.3d at 1304 (alternate juror was a witness to facts in the case); *Whatley*, 719 F.3d at 1219 (exhibit that was excluded by the court was inadvertently sent back into the jury room). In this case, the contact was minimal and it reached one or more jurors directly in open court—an incident so slight that it went unnoticed by all of counsel, the parties, the court, and the courtroom security officers. It did not originate with the Government. And even if it is assumed that the jury believed it was one of McGowan's supporters who took a photo in this context (*i.e.*, given the limited impact of the incident), such contact should not be used by McGowan to gain a new trial. Such a decision

would only encourage supporters of a defendant who is facing substantial evidence of criminal wrongdoing to act up in court in hopes of obtaining a new trial. *See, Tejeda*, 481 F.3d at 52.

        3.      <u>The factual findings in the district court and the manner of the court's inquiry into the juror issues</u>

Once the court received the first jury note, it immediately met with counsel and the United States Marshal. Before taking any action, the court sought input from counsel and made certain that both sides agreed on the appropriate course of action. The consensus was that the appropriate way to handle the situation was to advise the jury that the matter was being looked into, but that the jury should continue its deliberations. The courtroom deputy delivered this message. There was no indication from the jurors that they were fearful, intimidated, or otherwise unable to deliberate. To the contrary, the jury continued its deliberations in a work-like manner. It made no other mention of the issue. The approach taken by the parties and the court was a measured response to the jury's note, and the manner in which the issue was handled was designed to avoid injecting prejudice where none existed. To be sure, McGowan only raised the issue of mistrial in connection with the jury's first note when the jury's third question (related to quantity of the controlled substance) suggested a guilty verdict was likely.

        4.      <u>The strength of the Government's case</u>

The strength of the Government's case also weighs in favor of overruling McGowan's Rule 33 motion. The basement of the home at 1156 Skyline Drive was a cocaine trafficking and processing center. In the garage was the grey Lexus with its bumper removed exposing the hidden compartments. Over $110,000 was being packaged by Figueroa for shipment when agents arrived. Among the items seized from the basement kitchen were stacks of cocaine, digital scales, a FoodSaver machine and numerous FoodSaver bags, a money counter, and 46 empty kilogram wrappers, some with cocaine residue, and two of which had McGowan's latent

fingerprints on them.  When McGowan was stopped that day, agents seized his Sam's Club card.  Records from Sam's Club showed that the card was used to purchase four money counters of the same make and model.  Two of the money counters were obtained just one week before the events at Skyline Drive unraveled.  From the back of McGowan's Jeep, agents also seized a FoodSaver box for a FoodSaver machine that was the same series number as that recovered from the kitchen basement.  There were numerous other items linking McGowan to the basement bedroom of the home at 1156 Skyline Drive, including keepsakes from McGowan's grandfather's funeral and very personal greeting cards from his girlfriends.  Finally, Tavera testified about details of the conspiracy. It was his job to bring the cars loaded with cocaine to the Skyline Drive house where he would give the drugs to McGowan.  Tavera explained how he unpackaged the drugs and repackaged the money along with McGowan and how he had trained Figueroa to do the same.

### III. Conclusion

For the reasons stated above, McGowan's post-verdict motions for judgment of acquittal (Doc. 233) and new trial (Doc. 236) are due to be denied.  A separate order will be entered.

**DONE** and **ORDERED** this April 16, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE